```
 1                UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MINNESOTA

 3  -----------------------------------------------------------

 4  Irene A. Rogers,              Case No. 13-cv-1698 (SRN/TNL)

 5          Plaintiff,

 6    vs.
                                  St. Paul, Minnesota
 7  Bank of America, N.A.,        Courtroom 7B
    et al.,                       April 10, 2014
 8          Defendants.           2:00 p.m.

 9  -----------------------------------------------------------

10           BEFORE THE HONORABLE SUSAN RICHARD NELSON

11             UNITED STATES DISTRICT COURT JUDGE

12

13     HEARING ON DEFENDANTS' MOTION TO DISMISS [DOC. NO. 9]

14

15                         APPEARANCES

16  For the Plaintiff:          Michael J. Keogh, Esq.
                                Keogh Law Office
17                              P.O. Box 11297
                                St. Paul, MN 55111
18

19  For the Defendant:          Mark G. Schroeder, Esq.
                                Briggs & Morgan, PA
20                              80 S. 8th St., Ste. 2200
                                Minneapolis, MN 55402
21

22

23

    Official Court Reporter:  Heather Schuetz, RMR, CRR, CCP
24                            U.S. Courthouse, Ste. 146
                              316 North Robert Street
25                            St. Paul, Minnesota 55101
```

1          P R O C E E D I N G S

2              IN OPEN COURT

3          (Commencing at 2:06 p.m.)

4          THE COURT:  We are here this afternoon in the matter

5   of Irene Rogers versus Bank of America, et al.  This is civil

6   file number 13-1698.  Let's begin by having Counsel note your

7   appearances, please.

8          MR. KEOGH:  Michael Keogh, K-e-o-g-h, on behalf of

9   Plaintiff, Irene Rogers.

10         MR. SCHROEDER:  Good afternoon, Your Honor.  Mark

11  Schroeder from Briggs & Morgan.  I'm here on behalf of the

12  Defendants, Bank of America, NA; New York Bank Mellon; and

13  Mortgage Electronic Registration Systems, Inc.

14         THE COURT:  Very good.  And we are here today to

15  consider your motion to dismiss, Mr. Schroeder.

16         MR. SCHROEDER:  Thanks, Judge.  Yes, we are here on

17  the Defendant's Rule 12(b)(6) motion to dismiss.  I will try

18  to keep my remarks fairly brief because I think the issues and

19  the law are presented fairly well in the briefs that were

20  previously filed with the Court.  Two primary contentions, as

21  I understand the Complaint from Mrs. Rogers, are before you,

22  and I'd like to spend some time on both of the issues.

23         One is whether or not the mortgage foreclosure sale

24  should be voided for a couple of reasons as raised by the

25  Plaintiff.  And the second primary contention is whether there

1   was a breach of contract premised upon an alleged failure to
2   modify a mortgage loan.  We believe that the complaint fails
3   to state a claim for relief under either one of these
4   contentions, and I'd like to get into both of those
5   contentions specifically and try to explain why we think no
6   claim is stated in this Complaint.  Before I do so -- I don't
7   want to get bogged down in the allegations, but just to tick
8   off a quick chronology as to sort of what happened here.

9           We've got a mortgage loan represented by a Note and
10  mortgage that was originated in 2003.  Mr. Rogers was the only
11  party on the note, whereas the mortgage was signed by both
12  Mr. and Mrs. Rogers, with the MERS, Mortgage Electronic
13  Registration Systems, as the legal mortgagee of record.  In
14  the 2007 to 2009 timeframe, the mortgage loan goes into
15  default.  Unfortunately, it appears it's due to health --
16  serious health issues for Mr. Rogers, who ultimately passed
17  away.  During the time of those issues, there was an
18  Assignment of the mortgage instrument from MERS to Bank of New
19  York Mellon that was dated June 10th of 2008.

20          That Assignment, which we contended is the operative
21  Assignment of Mortgage as attached to the Anderson Affidavit
22  at Exhibit C that we filed with our motion papers, there were
23  attempts during the same timeframe and then going into the
24  time that a Notice of Foreclosure Sale was served that there
25  were various efforts and discussions about a potential loan

1  modification by Mrs. Rogers with Bank of America, who operated

2  as a servicer of this mortgage loan, but those attempts were

3  unsuccessful.

4          Ultimately, a Notice of Foreclosure Sale was served

5  on February 20 of 2012 with a foreclosure sale that was

6  consummated in May of 2013.  And documents reflecting the

7  foreclosure sale notice and the Sheriff's Certificate of Sale

8  are attached as Exhibit E to Mr. Anderson's Affidavit.  With

9  that background, then, I'd like to get into the two primary

10 contentions.

11         First -- and I think this will be the bulk of my

12 comments this afternoon -- is whether or not the Complaint

13 properly provides a basis to either void the foreclosure sale

14 or somehow void the Assignment of Mortgage from MERS to Bank

15 of New York Mellon.  In Counts 1 and 2 of the Complaint, the

16 Plaintiff seeks declaratory relief with respect to those

17 matters.  In the first instance, let's talk about whether or

18 not the Assignments of Mortgage are invalid.  And I understand

19 that Plaintiff makes two contentions -- well, they -- the

20 primary contention is that somehow the Assignment of Mortgage

21 was improper because it was done after the time that a

22 securitized pool of loans had closed, and therefore

23 purportedly violated the terms of a Pooling and Servicing

24 Agreement that reflected the securitization and was thus void

25 under New York trust law.

1          We've presented two reasons why we think that the

2    New York trust law argument fails and that there's no basis to

3    invalidate the 2008 Assignment of Mortgage.  First, the

4    Plaintiff, who was not a party to the Pooling and Servicing

5    Agreement, has no standing to challenge what the parties did

6    or didn't do with respect to that Agreement.  The law is very

7    clear on that issue, probably the most specific pronouncement

8    of that is the *Karnatcheva* case of the Eighth Circuit.  I know

9    that this -- the District of Minnesota and you, Judge Nelson,

10   specifically have dealt with whether or not mortgagors have

11   any right to assert -- or any standing to assert claims for

12   purported violations of Pooling and Servicing Agreements.

13          And I think the answer has been uniform in the

14   District, and that is that the Plaintiff does not have

15   standing.  I would note two of your cases -- and I don't

16   recall whether we had cited these in our brief or not -- but

17   the *Nelson versus Bank of America* case and a *Peterson versus*

18   *Citimortgage* case.  Both were before you on motions to

19   dismiss, and you concluded in those cases that a

20   Plaintiff/borrower did not have standing to assert claims that

21   someone violated a Pooling and Servicing Agreement.

22          The second and potentially more novel argument is

23   whether or not there's some sort of violation of New York

24   trust law that would invalidate the Assignment of Mortgage

25   that postdated the closing of the acquisition of mortgage

1  loans by the trust.  Mr. Keogh in his brief cites a couple of
2  cases, one out of New York, *Erobobo* -- and I'll get you a
3  spelling on that, Heather, at an appropriate point -- and
4  another case, *Glaski* out of California, that discussed New
5  York trust law.  We addressed those cases in our reply brief,
6  and it's clear that both of those cases cited by the Plaintiff
7  are outliers and that the vast majority of Federal Courts to
8  look at the analysis in those cases has rejected the premise
9  that somehow mortgage instruments that are signed after the
10 closing of a securitized trust are somehow void.
11         The courts, rather, have said, at best, the
12 instrument may be voidable, but the law is that New York trust
13 law does not provide a basis to void those foreclosures.  Of
14 more interest and actually a couple of cases have come down in
15 this District that post-date our briefing on this motion to
16 dismiss that have square-on dealt with this same New York
17 trust law issue.  And I'd like to just identify them for the
18 Court and I've got extra copies, if you'd like to see them --
19         THE COURT:  That would be great.  That would be
20 great.
21         MR. SCHROEDER:  If I may approach, Your Honor.
22         THE COURT:  You may.
23         **(The Court is handed a document.)**
24         MR. SCHROEDER:  Your Honor, I've just handed the
25 Court and Plaintiff's counsel two recent cases in this

1   District that have addressed the New York trust law issue and

2   have both have concluded that the same kinds of arguments do

3   not provide a basis to invalidate Assignments of Mortgage

4   instruments after the closing date of a mortgage.  The first

5   one is the *Wolff* case.  It said an order from Judge Schiltz in

6   February of 2014 reported at 2014 Westlaw 641510.  Judge

7   Schiltz does a couple things in his order.  First, he finds

8   that the mortgagor borrower doesn't have standing to raise the

9   argument.  But then he makes the observation at *1 of the case

10  that as to mortgages originally held by MERS, which would be

11  the situation here, the PSA requires only that a copy of the

12  mortgage be delivered to the Trustee by a particular date.  It

13  does not require that those mortgages be assigned to the

14  Trustee by a particular date.

15          We think that that analysis is dispositive here.

16  More telling is Magistrate Judge Mayeron in her Report and

17  Recommendation in *Wolff*, which is appended to the *Wolff*

18  decision that I just handed to the Court, she looked

19  specifically at the New York cases, the same cases that are

20  cited by Mr. Keogh.  And she looked at this issue of void

21  versus voidable and concludes, much like the cases we cite in

22  our reply brief, that at best the Assignment of Mortgage would

23  be voidable under New York law.  She provides authority for

24  that proposition, and I'm sorry -- that's at *9 of the Westlaw

25  opinion where she gets into that discussion.

1       We think *Wolff* is on all fours in much the same way

2  the other case that I handed to the Court and to counsel this

3  afternoon, *Twigg versus U.S. Bank* reported at 2014 Westlaw

4  755230, is also a report -- well, it's an order from Judge

5  Montgomery again rejecting this similar sort of an argument at

6  *3 of the decision.  We think the district has weighed in on

7  this issue.  It has rejected it, it's consistent with the

8  decisions in other districts, and we think that this argument

9  fails as a matter of law.  And thus, the Assignment of

10  Mortgage from MERS to Bank of New York in 2008 is not

11  invalidated because of New York trust law.

12       The other basis on which Plaintiff attempts to seek

13  to void the foreclosure sale is, as I understand it, to say

14  that there was a second Assignment of Mortgage that was not

15  listed in the Notice of Foreclosure Sale and therefore there

16  was some violation of the Minnesota statutes regarding the

17  statute concerning foreclosure by advertisement.  This

18  argument, too, fails for a couple reasons.  The primary reason

19  is that this second purported Assignment of Mortgage is a

20  nullity as a matter of fact and a matter of law.

21       And what I'm talking about, Judge, just so it's

22  clear, there was an Assignment of Mortgage again from MERS to

23  Bank of New York Mellon that was approximately, I guess, three

24  years after the Assignment that we were talking about earlier.

25  It was dated October 7th of 2011.  It's appended to the

1    Complaint as Exhibit G.  But that second purported Assignment

2    doesn't assign anything because it's the same instrument, just

3    with a different date.  It attempts to assign MERS' rights in

4    the mortgage to the same assignee, The Bank of New York

5    Mellon.  But in 2011, MERS didn't have anything to assign

6    because it had already assigned its rights to bank of New York

7    Mellon.

8           So, basically it's a nullity.  It doesn't assign

9    anything whatsoever, and a similar situation came up in a case

10   that wound its way up to the Minnesota Court of Appeals that

11   we cite in our reply brief.  It's the *Oppong* case.  It's in

12   our Reply at Page 9, note three -- footnote three.  And in

13   that case, there was a similar situation where there was a

14   second purported Assignment of a Mortgage instrument between

15   the same assignor and the same assignee.  And the Court in the

16   *Oppong* case, the appellate court, had no problem finding that

17   that second Assignment essentially was null and did not impact

18   the validity of the foreclosure sale.

19          We think that that line of cases recognized by

20   *Oppong* supports finding that this second purported Assignment

21   doesn't invalidate anything.  And what's crucial here is

22   there's never a break in the chain of title.  The chain of

23   title, which is the reason that Assignments of Mortgage are

24   supposed to be recorded under Chapter 580, the foreclosure by

25   advertisement statute, was clear.  It went from the original

1   mortgagee, MERS, to the Bank of New York Mellon which was the

2   entity that foreclosed on the Rogers mortgage.  So, we think

3   that there's a clean chain, and there's no basis to invalidate

4   the foreclosure sale.

5          And despite this second purported mortgage, I think

6   it's clear that there was complete and full compliance with

7   the requirements of Chapter 580, both section .02 and .04

8   insofar as the foreclosure.  Well, first, the operative

9   Assignment of Mortgage was recorded, which is what's required

10  by 580.02, and then the mortgagee and the assignee were both

11  identified in a Notice of Foreclosure Sale, which is what's

12  required under chapter 580.04.  Given full compliance with

13  Chapter 580, the foreclosure sale is valid and should not be

14  voided.

15         We think there's no basis for declaratory relief as

16  sought in Counts 1 and 2, and those counts should be

17  dismissed.  Final point on this Assignment issue and whether

18  or not the sale could be voided, there is three more claims

19  that are -- I'll kind of describe as the statutory claim and

20  the common law defamation claim.  Count 4 is for defamation,

21  Count 5 is a Minnesota Chapter 58 claim, and Count 6 is a

22  Minnesota Statute Section 8.31 claim.  All three of those

23  claims are really premised upon there being an improper or

24  invalid Assignment or an improper or void foreclosure sale.

25  And based on what I've just discussed with respect to the

1    declaratory judgment counts, if there's not an invalid

2    Assignment or an invalid mortgage, there's no basis to proceed

3    on either the statutory or defamation claims.  We think those

4    counts should also be dismissed.

5              That takes me to what I think is sort of the final

6    contention.  That's the last count of the Complaint.  This is

7    the breach of contract claim, Count 3 of the Complaint.  And

8    this is the contention that relates to whether or not there

9    was a breach of contract by a failure to modify the loan.  We

10   think that that count also fails to state a claim for two

11   reasons.  First, there is no enforceable agreement that

12   complies with the Minnesota Credit Agreement statute, which is

13   Minnesota Statute 513.33.  And as because there is no written

14   Loan Modification Agreement between the parties that was

15   executed by all the parties, and that's -- those are the

16   explicit requirements under that statute.

17             We have cited numerous cases, many of which are in

18   this Court, in which breach of contract claims in the context

19   of purported loan modifications have been dismissed for

20   failure to comply with the credit agreement statute.  We think

21   that those cases control here, and the operative part of the

22   Complaint that would warrant dismissal is paragraph 69 where I

23   think there essentially is an admission with the allegation

24   that there was no Loan Modification Agreement executed by Bank

25   of America, the servicer.

1          The second reason that Count 3, the breach of

2    contract claim, should be dismissed besides the failure to

3    comply with the credit agreement statute is there never was a

4    Loan Modification Agreement at all.  In fact, as alleged in

5    the Complaint, in at least three cases -- paragraphs 35, 42,

6    and 43 -- the servicer declined to modify the loan and so

7    advised Mrs. Rogers because she was not a party to the Note.

8    So, there was no agreement between these parties to modify the

9    existing mortgage loan.  So, we think there's no basis to

10   proceed, nor is there a claim stated on Count 3.

11          And with that, I would ask the Court to do two

12   things:  First, to grant the motion to dismiss, and second to

13   dismiss all claims with prejudice and on the merits.

14          THE COURT:  Thank you very much.

15          MR. SCHROEDER:  Thank you.

16          THE COURT:  Mr. Keogh.

17          MR. KEOGH:  Before I start my argument, I'd like to

18   clarify, if I could, who, if anybody, represents Bank of New

19   York Mellon Trust Company.  They're a party to this lawsuit,

20   and you didn't mention that you represented them or who does.

21          MR. SCHROEDER:  Yeah, well, I do.  And I guess I

22   used a shorthand.  I think we entered our motion papers on

23   behalf of New York Bank as the Trustee of the securitized

24   entity and --

25          MR. KEOGH:  No, but there's two co-trustees, so you

1    represent both of them?

2              MR. SCHROEDER:  Um, I think I do.

3              MR. KEOGH:  Okay.  I was just -- don't know.

4              MR. SCHROEDER:  Your Honor, may I just clarify I

5    represent the Defendants that are named in the action.

6              THE COURT:  I get it.  Yep.  Okay.

7              MR. KEOGH:  Well, there's basically two -- the

8    claims pled fall into two groups.  The one is for not

9    following the Minnesota foreclosure statute and Minnesota law,

10   and the other one surrounds the Assignments of record not

11   being valid under the New York trust laws.

12             But before I get into that, because especially the

13   part about the trust laws is a complex argument that many

14   people have unsuccessfully tried to make in this District, I'd

15   like to talk about what we do know.  And what we do know, what

16   the other side does not dispute is Irene Rogers has been an

17   owner on title to that house since 2003.  The mortgage that is

18   in dispute now was not originated in 2003; it was originated

19   in 2005.  It was not to buy the house, it was to re-fi the

20   house.  And it was at that time Countrywide, which of course

21   Bank of America, successor by merger, to -- re-fi'd two prior

22   loans of their own.  We're here today, in a way, because of a

23   broker who is an independent but worked for Countrywide named

24   Daniel Kana (ph).  And when he filled out the credit

25   application, he put Mr. Rogers on it, but he didn't put

1    Mrs. Rogers on it.  And so she ended up signing the mortgage

2    lien, which created the power to foreclose potentially on the

3    originator and any assignees.

4          But it's the reason -- it's the reason why even

5    though she performed and she was ready for a HAMP loan

6    modification -- and there was another now-defunct federal

7    program that would give her up to $50,000, which was less than

8    the amount due -- and the reason Bank of America turned down

9    both modification things that it extended was because,

10   although they could foreclose on her, although she was the

11   owner -- at that time she was the only owner of the thing and

12   she was the sole (inaudible), and they had knowledge because

13   they got a copy of the letter testamentary -- she was the

14   only -- she was the only -- the personal representative of the

15   estate, they wouldn't deal with her.

16         THE COURT:  And that may feel inequitable, but

17   there's no cause of action for that, is there, against these

18   Defendants.

19         MR. KEOGH:  My understanding, just to answer this

20   question, is that in this circumstance when the debt, the

21   Note, was only in the name of the decedent, it went to the

22   estate.  After she told them her husband had died, when it

23   came around to do it, she was that -- she gave them

24   documentation that not only did she have authority to deal

25   with it, she was the only person with authority to deal with

1    it --

2           THE COURT:  I hear what you're saying.  It doesn't

3    create a cause of action, does it, sir?  Lots of inequities in

4    this world that we can't address in Federal Court, right?

5           MR. KEOGH:  I understand.  I will say -- I will say

6    and I will ask for an opportunity to supplement that Bank of

7    America turning her down because she is not on a Note, there

8    has been litigation over an FHA rule that did it and now is an

9    exempt transaction that you cannot turn somebody down for a

10   HAMP loan modification on.

11          THE COURT:  But that's subsequent.

12          MR. KEOGH:  I don't know when the rule got changed,

13   but I would certainly offer to supplement with the effective

14   date.

15          They also don't dispute that New York trust law

16   controls the Pooling and Service Agreement, aside from the

17   standing issue.  And as far as the Assignments of Mortgage,

18   I'm a bit confused because in their original motion, they

19   say -- they argue that the second one controls; the first one

20   doesn't matter.  And now in their reply brief and now the

21   argument I just heard, they said the second one -- if the

22   first one controls, the second one is a nullity.

23          THE COURT:  I read them to always say the first one

24   controls.  Am I wrong, Mr. Schroeder, about that?

25          MR. SCHROEDER:  I re-read the briefs.  That

1  certainly was the position that I thought we were

2  articulating, and certainly it's what I've tried to present

3  today.

4          THE COURT:  Okay.

5          MR. KEOGH:  I'll start with the easier part, the one

6  that sounds on Minnesota law about that.  Their argument is

7  rather tortured.  They bring up *Jackson*.  And one of the

8  things that *Jackson* says on MERS loans, which this is

9  admittedly one, you don't have to record an Assignment at all.

10 *Jackson* also says -- *Jackson* also -- *Jackson* also says that

11 MERS doesn't do anything.  MERS doesn't assign, MERS doesn't

12 do it, they just act as a nominee for whoever originates the

13 loan.  If that's true and they didn't record, I don't know why

14 they recorded two assignments who weren't signed by anybody,

15 anybody who actually loaned money to anyone.  They were signed

16 by two different -- two different employees or designees of

17 MERS.

18         THE COURT:  But they did assign, and so all of this

19 is moot, isn't it?  Again, a frustration, but there is an

20 Assignment and a clear chain of title, is there not?

21         MR. KEOGH:  Well, there is one thing is -- that's

22 the other thing.  The other thing is before we get into the

23 New York trust law parts of this and the validity of the

24 Assignments are not under that, why did they assign twice when

25 Minnesota law says they don't have to do it at all?

1          THE COURT:  Well, who knows, but we don't care.  We

2     don't care, do we?  I mean, why do we care?  Do you care?  I

3     mean --

4          MR. KEOGH:  I do care because basically *Jackson* --

5     and MERS says also MERS has nothing to assign.  And the only

6     Assignments of Mortgage, there is no Assignment whatsoever

7     from the original creditor to The Bank of New York Trust, even

8     if they were legally able to take the mortgage at the time

9     that it was purportedly assigned.  That's why I -- that's why

10    they -- we care, or at least that's why I care.

11         Now, before I get into New York trust law, I will

12    just note that every single Minnesota District case was either

13    brought by a pro se litigant or the local attorney that we

14    diplomatically refer to as "the attorney that was sanctioned,"

15    who started getting sanctioned about two years ago; who, if I

16    recall correctly, the Eighth Circuit said, Quit appealing

17    these cases or we'll sanction you, too.  The two cases that I

18    hadn't seen before they brought, one was brought by that

19    attorney, and the other one was brought by another lawyer in

20    his office.

21         So, this is a very complicated issue as far as

22    securitization failure.  It would be an exceptional pro se

23    litigant who could plead it so it could pass muster under

24    *Iqbal* and *Twombly*, and the counselor I'm diplomatically and

25    euphemistically referring to obviously proved multiple times

1    he could not.  As far as --

2              THE COURT:  Explain to me why Judge Schiltz is

3    wrong.  Judge Schiltz is often not wrong, so explain to me why

4    Judge Schiltz is wrong in concluding that your client would

5    have no standing.

6              MR. KEOGH:  Well, which case in particular are you

7    referring to, Your Honor?  The new one?

8              THE COURT:  Referring to the new one, the *Wolff*

9    case.  It looks to me that Judge Schiltz finds no standing,

10   and he says, as to mortgages originally held by MERS, the PSA

11   requires only that a copy of the mortgage be delivered to the

12   Trustee by a particular date.  It does not require that those

13   mortgages be assigned to the Trustee by a particular date.  It

14   looks like those are the two basis of his opinion.  And he

15   cites to *Karnatcheva*, the Eighth Circuit decision, with

16   respect to standing.

17             MR. KEOGH:  Which is, of course, another Butler

18   case.

19             THE COURT:  Yes, but presumably the Eighth Circuit

20   can sort this through here.

21             MR. KEOGH:  Yes, but even the Eighth Circuit would

22   not need to do much to affirm if the case wasn't pled properly

23   from the beginning.

24             THE COURT:  Well, I am bound by the Eighth Circuit's

25   decision in *Karnatcheva*, wouldn't you agree?

1    MR. KEOGH:  And I understand, so I will say what

2  this is.  The first person to opine on this -- and it's on

3  Page 9 of my brief -- is that is the *Greene* case.  And

4  basically Judge Frank said two things in that.  And he said,

5  one, this is improperly pled, which I took as a shorthand it

6  doesn't pass under *Iqbal* and *Twombly*.  And the second thing is

7  he says they don't have standing, but there's absolutely no

8  legal analysis or one case cited for why they have standing --

9    THE COURT:  Okay.  You tell me why your client has

10  standing.

11    MR. KEOGH:  I have standing because this is not a

12  normal trust.  This is not a testamentary trust that's set

13  up -- set up for estates in trusts purposes.  This isn't a

14  trust that is set up for business purposes or asset protection

15  purposes.  This is public.  This is public because it is a

16  security that is sold and registered with the Securities and

17  Exchange Commission.  And the reason they make these

18  securitized trusts are for two primary reasons from the

19  business end to put this together.

20    One is they want to put together this investment and

21  securitize it and sell it to investors, of course.  They do

22  that, but there are many companies, usually at least six,

23  involved in these.  And they set it up in a trust so it's what

24  they call, a term of art, "bankruptcy remote."  So if anything

25  happens where one of the people in there goes into -- one of

1    them goes into bankruptcy, that the other people in the trust

2    don't (multiple inaudible words), or at least the lost is

3    limited to the trust.

4           Other possibly compelling things are these trusts

5    are afforded a special tax treatment by the IRS, which is

6    where you get the 90-day cutoff; the IRS Code is cited, I

7    believe it's 860D.  The trusts we're talking about right now

8    is composed of, I believe, three or four real estate

9    investment corporations.  And the significance of that is is

10   if they go ahead and everything is done properly with the

11   trust, the investors who buy the certificates that comprise

12   the trust, the interest that they get by virtue of their

13   ownership comes to them tax free.

14          THE COURT:  But what creates standing for your

15   client?

16          MR. KEOGH:  What creates standing for my -- for my

17   client is that this is -- this is public.  There is New York

18   law -- they say it's voidable; they cite a number of -- they

19   cite a number of cases for this position, a couple from

20   District Courts, but they do not state one New York state case

21   that says that that's voidable.  The plain language of the

22   statute, which I cite in my materials, says if the Trustee

23   acts in contravention, it is void.

24          THE COURT:  That may be the case.  Why does your

25   client have standing?  I still don't understand the connection

1    between your client and this troubling trust.

2            MR. KEOGH:  Because the trust tells the IRS and the

3    Securities and Exchange in exchange for special treatment and

4    access to capital that it's going to do things according to

5    this.  The New York law -- and these are almost uniformly done

6    under New York or Delaware law because the trust laws in that

7    state say that acts in contradiction in written trusts by the

8    Trustee are not "voidable" like they are in the other 48

9    states but "void," otherwise the IRS would not approve the tax

10   treatment.

11           If the acts -- if the -- if there's at least a *prima*

12   *facia* case that it's acting outside the trust, like in this

13   case where the Trustee was supposed to do the Assignment

14   within 90 days of it and didn't do it until literally years

15   later, the Trustee has no legal authority behind it.  He

16   doesn't have the authority behind it, and they're depriving

17   the client of not just property, but her homestead property,

18   which is protected by, among other things, the Minnesota

19   Constitution, the Minnesota property laws.

20           This is a title case.  The other case -- all you can

21   really derive from the cases cited against standing in this is

22   that they weren't properly pled.  If there was one where it

23   was actually analyzed on the merits beyond *Iqbal* and *Twombly*,

24   I'm not aware of it.  And *Greene* seemed to be the first one in

25   our district to analyze it.  I can understand the argument if

1    it was a normal trust, but this is not a normal trust.  This

2    is a publicly-offered security, and the Trustee is

3    circumscribed by the Trust Agreement under New York law.

4         Also, I'm not aware in any of those other cases they

5    asked for a Declaration under New York law because

6    everybody -- because every case of them I read -- and I

7    believe I read all of them -- was under Minnesota law.

8    Minnesota law has nothing to do with the action of the trust,

9    and in this case the Defendants do not dispute that New York

10   law controls.  Ultimately, although this is declaratory

11   judgment and everything else, this is a title case.  The only

12   person alive who had title to this property since 2003 is

13   Irene Rogers.  The co-trustees -- the co-trustees acted in

14   contravention of their trust agreement.  They acted in

15   contravention of the states code -- pardon me, the IRS Code,

16   that gives them the favorable tax treatment on this.

17        MERS, whatever it -- despite the Minnesota Supreme

18   Court's guidance that they don't do anything, were the only

19   ones that assigned, and they assigned when apparently

20   Minnesota law says they didn't have to do anything.  So if

21   they didn't have to do anything and it wasn't necessary, why

22   did they do it?  And it still -- and I dispute the fact there

23   is an unbroken chain of title because there's no Assignment

24   whatsoever from the original creditor, which was Countrywide,

25   to this trust.  MERS didn't -- MERS -- MERS did not lend my

1    client any money because MERS doesn't do that.  The trust

2    didn't own -- the trust didn't loan my client any money.

3            And I've got here -- because it's a standard form --

4    this is a Uniform Conveyancing for Mortgage Satisfaction by

5    Assignee.  The form number is 20.5.5.  It's the form that's

6    filled out and recorded when somebody pays off a mortgage loan

7    in Minnesota.  But the problem is with the state of the title

8    on this, if my client had every penny -- and we don't dispute

9    she's in default.  We do dispute that the title would -- the

10   title to her property -- the foreclosure sale is void, the

11   Assignments were not recorded to legal satisfaction, and

12   consequently asking for declaration that she remains in title

13   of the mortgage.

14           Who would sign this?  Countrywide says they -- Bank

15   of America says they have nothing to do with it.  There are

16   two co-trustees.  There are two co-trustees:  Bank of New York

17   Mellon and Bank of New York Mellon Trust.  Bank of New York

18   Mellon Trust is, although they're a Trustee, co-trustee,

19   they're the only one who hasn't put their name on something

20   related to this.  And the thing is, is without an opportunity

21   for discovery, we don't know because when they put it into

22   this trust, they put it into a private world.  If you look and

23   you can see this on -- in Exhibit 3, Sections 2.01, the

24   internal pagination on Page 61.  But as far as the exhibit

25   goes -- it's Page 78 -- there is this incredibly intricate way

1    on how you get mortgage trust, which this mortgage would

2    ostensibly have to get into somehow, and there's no way of

3    confirming it because it's private.

4            Also, I know you're familiar -- because the name

5    escapes me -- because I know you've decided at least a couple

6    of cases after the Minnesota Supreme Court decided *Ruiz* last

7    April.

8            THE COURT:  Yes.

9            MR. KEOGH:  Nobody knows.  It's a gray area.  There

10   is no authority whatsoever how *Jackson v. MERS* and *Ruiz*

11   interacts, whether *Ruiz* changes or modifies or is completely

12   separate.  And until somebody brings a case with those kinds

13   of facts through the -- either through the Court of Appeals or

14   a case that's brought in this District is certified to the

15   Minnesota Supreme Court, we really don't know.  No one really

16   knows.

17           Lastly, I'll just speak very briefly about the

18   contract claim, and then I'll conclude my arguments unless the

19   Court has any questions.

20           THE COURT:  Thank you.

21           MR. KEOGH:  Modification of any contract, especially

22   one governed by the statute of frauds, as mortgages are on

23   multiple basis, are voluntary.  We concede that.  Unless both

24   parties agreed in writing, it's not enforceable.  But when my

25   client was in default, they didn't -- they made an offer which

1    she fully performed under, and then they unilaterally and

2    arbitrarily did it because they thought she wasn't a party to

3    the debt.

4           But they had actual knowledge not once but twice

5    that by virtue of being the personal representative of her

6    husband's estate, she had authority to deal with the debt.

7    After they found out her husband is dead, they actually

8    changed the bills to "Estate of John Rogers," but they refused

9    to deal with the personal representative of the estate.

10          THE COURT:  And unfortunately the law says we can't

11   do anything about that, as unfair as that might seem.  Am I

12   right?

13          MR. KEOGH:  I would say that she performed fully,

14   and they had -- and they were -- there was a duty to deal with

15   her because she was the sole living person left who had

16   ability to deal with that debt.  And the Bank of America has

17   no authority whatsoever not to deal with her just because its

18   employee in 2005 didn't put her on the Note but put her on the

19   mortgage and put her on everything else.  And he didn't put

20   her on the note for the reason every mortgage broker doesn't

21   put somebody who is on the property on the Note.  It's so they

22   can get it through underwriting quicker and get their things

23   and get their commission.

24          If it were another broker, it would be an entirely

25   different fact pattern, but Bank of America created this.  But

1    when their employee didn't put her in the credit application

2    like they should have, Bank of America -- Irene Rogers had

3    nothing to do with this being purportedly sold to a

4    securitized mortgage trust.  Obviously, she's a borrower, so

5    she has no -- she has nothing -- she has nothing to do with

6    complying with the state foreclosure statute.  And so -- and

7    she did -- she was diligent in every way, shape, or form in

8    relation to the offers that Bank of America has, but yet they

9    have no accountability for any of it.

10           Before I ask -- before I ask the Court for what I

11   would like with respect to this motion, I will just say that

12   if you say that no plausible claim exists here, you're

13   abrogating the estate laws in Minnesota, you are abrogating

14   the foreclosure statute which, quite frankly, is not all that

15   hard to comply with.  As a matter of fact, if you read their

16   briefs, they admit the primary problem from the foreclosure

17   perspective were there were two Assignments and all the

18   Assignments had to be on the Notice of Foreclosure Sale.  They

19   didn't put the first one on there.  They admit it.

20           And under *Jackson*, under *Moore*, you don't strictly

21   comply with the statute, aside from a couple of cases that

22   have.  And this isn't on point with those.  It's void.  And

23   basically, also what you're saying is that a homeowner

24   where -- basically a homeowner who has the misfortune of

25   having this assigned to some kind of securitized mortgage

1   trust, whether they follow the securities and tax laws doing

2   that and follow their own thing and act in contravention of

3   New York state law -- which by the way they couldn't come up

4   with a New York state law that -- a New York state case that

5   says it's voidable, not void -- or a case that wasn't either

6   pro se or from -- I'll be diplomatic here and say a "tainted

7   pool of decisions," there is nothing you can do.

8           Apparently, all they have to do is file -- file --

9   file an Assignment at some point that does -- that is -- that

10  doesn't form an unbroken chain of title, and invest in your

11  property through a non-judicial statutory procedure.  And

12  lastly, because -- because -- because it's an unsettled issue

13  and neither the Supreme Court or anybody else has opined on it

14  yet, by -- by -- by -- if this motion is granted, you arguably

15  abrogate *Ruiz*.

16          THE COURT:  Well, I'm sure the Eighth Circuit will

17  straighten me out, huh.

18          MR. KEOGH:  Well, if that's the -- if that's the

19  case, that would be -- that would be the case.  But I believe

20  it's distinguishable because I don't believe any of the cases

21  that they cited ever asked for Declaration under the New York

22  law.  They all ask for Declaration under Minnesota law which

23  does not control here.  And I am not sure whether all those

24  other Pooling and Service Agreements in all those other cases,

25  but I would be willing to wager that they were all under New

1   York or Delaware law.  Those cases failed not because there

2   were no merits, not because there was no standing, but because

3   they were improperly pled.

4           In closing, I ask that it be denied.  I ask that

5   because they brought -- they did a substantial amount of

6   authority on the New York trust thing in the reply and I had

7   no upper hand, I asked for a short supplemental brief with no

8   argument so there is an equal amount of authority on the other

9   side of that issue --

10          THE COURT:  Just on the New York trust issue --

11          MR. KEOGH:  I would like -- I'm sorry, Your Honor.

12   I didn't mean to step on you.

13          THE COURT:  As it is argued in their reply, is that

14   what you're saying?

15          MR. KEOGH:  I would like to do the -- I would like

16   to do, yes, the authority on the other side of the issue.  I

17   would also like to supplement -- I would also like to cite the

18   case holding -- supplement the case, and there's just one, I

19   believe, saying that doing an FHA loan and foreclosing on it

20   with the surviving spouse was illegal and citing the HAMP

21   regulation that says that denying a loan modification under

22   HAMP to a surviving spouse that is on the Note is exempt.

23          THE COURT:  Wouldn't that be amending your

24   Complaint?

25          MR. KEOGH:  No.  It's already -- it's -- it's

1    already in there.  It's just that -- it's just the thing that
2    it was already improper.  I'm not putting forth a new claim;
3    I'm just supporting what's already in there.
4               THE COURT:  I'll give you five extra pages to be
5    submitted within a week.
6               MR. KEOGH:  Thank you.
7               Lastly, if I survive the motion, I would like -- I
8    would like leave to amend.  And specifically that leave to
9    amend would be to add a count under Minnesota Statute 559 to
10   determine adverse claims, to remove the two Assignments of
11   record as being without legal force and effect, and add an
12   additional count for specific performance.
13              THE COURT:  Thank you.
14              Mr. Schroeder, a brief response.
15              MR. SCHROEDER:  Two things briefly, Your Honor.
16   First, on the issue of New York law, I would again just turn
17   the Court's attention to Magistrate Judge Mayeron's Report and
18   Recommendation in the *Wolff* action.  That's one of the cases
19   that post-dated our briefing.  It's the one I presented to
20   you, 2014 Westlaw 641510.  Her discussion at *9, she concludes
21   that New York law does not void The Bank of New York Mellon's
22   trust in the mortgage.  And in so doing, she has a relatively
23   lengthy citation to a number of cases.  And the reason I
24   reference this again is just, as best I can tell, there's at
25   least four cases that Judge Mayeron cites that emanate out of

1  the New York State Courts, so I would encourage the Court to

2  take a look at that authority.

3       Second and final point is just sort of a brief

4  response to the last request from Mr. Keogh.  I think we were

5  hearing about some potential issues that are not pled in his

6  Complaint, and I would ask the Court to disregard claims or

7  allegations that aren't presented.  To the extent the

8  supplemental briefing that Mr. Keogh will be presenting to the

9  Court does get into issues like HAMP or FHA, I don't want to

10 overbrief anything, but I would request an opportunity to have

11 some right to respond to some new issue that hasn't been

12 before the Court to date.

13       THE COURT:  Well, let me be clear.  The five pages

14 are focused only on issues presented to the Court to date.

15 Very good.  And Mr. Schroeder, after reading the five pages,

16 if you still think you need an opportunity for a reply, just

17 make the request.

18       MR. SCHROEDER:  I will.  I appreciate that.  Thank

19 you, Judge.

20       THE COURT:  Very good.  You bet.  This matter will

21 be taken under advisement.  Court is adjourned.

22            **(WHEREUPON, the matter was adjourned.)**

23                 (Concluding at 3:00 p.m.)

24

25                 *     *     *     *

CERTIFICATE

I, Heather A. Schuetz, certify that the foregoing is a correct transcript from the record of the proceedings in the above-entitled matter.

Certified by: s/ Heather A. Schuetz_____
                    Heather A. Schuetz, RMR, CRR, CCP
                    Official Court Reporter